```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF SOUTH CAROLINA
                         COLUMBIA DIVISION
_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )   Docket No. 7:23-883
                                    )
         vs.                        )   Columbia, SC
                                    )
KEVIN JETER,                        )
                                    )
         Defendant.                 )
_____)   DATE:  May 10, 2024

            BEFORE THE HONORABLE KEVIN MCDONALD
         UNITED STATES MAGISTRATE JUDGE, PRESIDING
                     DETENTION HEARING


A P P E A R A N C E S:

For the Plaintiffs:

JAMIE LEA NABORS SCHOEN
U.S. Attorney's Office
1441 Main Street, Suite 500
Columbia, SC 29201
803-929-3000
Email: jamie.l.schoen@usdoj.gov


For the Defendants:

HOWARD WALTON ANDERSON, III
Truluck Thomason LLC
3 Boyce Avenue
Greenville, SC 29631
864-331-1751
Email: howard@truluckthomason.com



            Electronically recorded by CourtSmart

         Transcribed by Karen V. Andersen, RMR, CRR
                  United States Court Reporter
                     901 Richland Street
                      Columbia, SC  29201
```

```
 1                            INDEX

 2                         EXAMINATION

 3   Witness Name                                              Page

 4

 5      BY MS. SCHOEN ........................................ 4

 6      BY MR. ANDERSON ..................................... 10

 7      BY MS. SCHOEN ....................................... 13

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          MS. SCHOEN:  Yes, Your Honor.  The next matter is
2   United States of America v. Kevin Jeter.  This is 7:23-883.
3   Mr. Jeter is present and represented by his attorney, Mr.
4   Howard Anderson.  And we are here for a detention hearing.
5          THE COURT:  All right.  Mr. Anderson, good to see
6   you.  And I appreciate your willingness to help Mr. Jeter.
7   The last time Mr. Jeter and I were together, he indicated he
8   had some communication problems with his attorney.  I heard
9   him out on that and thought it the best courses that new
10  counsel be introduced.  And I know, as I've told Mr. Jeter
11  when I last saw him, we have some very good lawyers who are
12  on our experienced, qualified list of defense attorneys.  And
13  you are certainly one of them.  I think you are at the top of
14  the list, alphabetically.  But I know you do a very good job.
15  You have the respect of the Court.  And I appreciate your
16  willingness to help Mr. Jeter.
17         We are here for a detention hearing.  Have you
18  spoken with Mr. Jeter about the detention hearing?
19         MR. ANDERSON:  I have, Your Honor.  And we are
20  prepared to proceed.
21         THE COURT:  Okay.  All right.  With that, I will
22  recognize the U.S. attorney.
23         MS. SCHOEN:  Yes, Your Honor.  The government calls
24  Special Agent Paul Criswell.
25         THE COURT:  Mr. Criswell, if you will come forward

```
 1   and be sworn.
 2              THE COURT DEPUTY:  State your name for the record.
 3              THE WITNESS:  Special Agent Paul Criswell.
 4                            PAUL CRISWELL,
 5        having been duly sworn, testifies as follows:
 6              THE COURT:  All right.  Are you ready to proceed?
 7              THE WITNESS:  Yes.
 8              THE COURT:  I recognize the U.S. attorney.
 9                          DIRECT EXAMINATION
10   BY MS. SCHOEN:
11        Q.   Please state your name and work experience for the
12   record.
13        A.   Special Agent Paul Criswell.  I'm with Homeland
14   Security Investigations.  And I've been employed with
15   Homeland Security Investigations for 21 years.
16        Q.   Do you have experience investigating drug
17   trafficking and firearms cases?
18        A.   I do.
19        Q.   And does that include investigations involving T-III
20   interceptions?
21        A.   Yes.
22        Q.   Was there a T-III in this case?
23        A.   Yes, there was.
24        Q.   Approximately how many defendants have been indicted
25   in this conspiracy?
```

1   A.   Currently 12.
2   Q.   Prior to the T-III investigation in this case, did
3   law enforcement conduct buys from Mr. Kevin Jeter?
4   A.   Yes, former county sheriff's office did.
5   Q.   Can you briefly summarize those?
6   A.   Several of those controlled purchases of narcotics,
7   specifically crack cocaine, were conducted at 605 Chesnee
8   Highway in Spartanburg, South Carolina, a location and
9   business that is associated with Mr. Jeter.
10  Q.   Was that approximately five buys?
11  A.   Roughly, yes.
12  Q.   And what was the date span that these buys occurred
13  in?
14  A.   I believe the initial controlled purchase occurred
15  in November of 2021.  And the most recent was, I believe, in
16  February of 2023.
17  Q.   You listed an address; 605 Chesnee Highway, was it?
18  A.   That's correct.
19  Q.   What is at that location?
20  A.   There was, I believe, a detail shop called Blood
21  Brothers.  And then also at one point, there was a vape-type
22  smoke shop called Lit.
23  Q.   And what relationship, to your knowledge, did Mr.
24  Jeter have with either of those businesses?
25  A.   Mr. Jeter has an LLC called Kevin R. Jeter, LLC,

6

1  that is associated with that address.  And information that
2  we developed throughout our investigation was that Mr. Jeter
3  ran both of those businesses.
4      Q.  During the course of your investigation, did law
5  enforcement receive court authorization to intercept the
6  phone calls and text messages of an individual you determined
7  to be the source of supply for drugs for Kevin Jeter?
8      A.  Yes.
9          MS. SCHOEN:  Your Honor, we are not going to -- and
10 I will advise the witness not to specifically discuss the
11 contents of the T-III, as we've discussed in previous
12 hearings, but, rather, we will summarize generally the
13 material, to limit any concerns regarding the privacy of the
14 parties.
15         THE COURT:  All right.
16 BY MS. SCHOEN:
17     Q.  During the T-III investigation, was Mr. Kevin Jeter
18 intercepted speaking with the source of supply for the drugs?
19     A.  Yes.
20     Q.  And during the course of the investigation, did they
21 discuss meeting together?
22     A.  Yes.
23     Q.  In some of those calls, did they agree to meet at
24 the shop?
25     A.  At their respective shops, yes.

1    Q.   And what were their respective shops?
2    A.   In regards to Mr. Jacobs, it was 501 Textile Road in
3    Spartanburg.  And in regards to Mr. Jeter, it was 605 Chesnee
4    Highway in Spartanburg.
5    Q.   Regarding 501 Textile Road -- you already told us
6    about the Chesnee location, can you tell us about what was
7    going on at 501 Textile Road?
8    A.   501 Textile Road was utilized by Michael Jacobs and
9    Maurice Rice and Terrance Bobo, other defendants in the
10   investigation, to distribute kilogram quantities of cocaine,
11   fentanyl, heroin, and methamphetamine into the surrounding
12   area in Spartanburg.
13   Q.   And were you able to confirm some of these meets
14   through surveillance?
15   A.   Through electronic surveillance and physical
16   surveillance, yes.
17   Q.   During some of the calls, did Mr. Jeter and the
18   source of supply discuss terms that would be commonly used in
19   drug trafficking?
20   A.   Yes.
21   Q.   And in those conversations, did the context appear
22   to be, based on your training and experience, for the
23   distribution of drugs?
24   A.   Yes.
25   Q.   On the date of the take-down in this case, generally

1   in the conspiracy, was a search warrant executed at Mr.
2   Jeter's shop at 605 Chesnee Highway?
3       A.   Yes.
4       Q.   And what was located there?
5       A.   At 605 Chesnee Highway, law enforcement located
6   286.5 grams of cocaine, digital scales, mail addressed to
7   Kevin Jeter, and also cutting agents utilized in the, I
8   guess, the stretching or cutting of the illegal drugs.
9       Q.   Did law enforcement obtain consent to search Mr.
10  Jeter's residence?
11      A.   Yes.
12      Q.   And what was located at Mr. Jeter's residence?
13      A.   Mr. Jeter himself, who was arrested pursuant to a
14  federal arrest warrant in the district of South Carolina, and
15  in addition to a Smith & Wesson SD9 handgun loaded on the
16  nightstand, a Smith & Wesson M&P 5-22 rifle, which was in the
17  master closet, 22 ammunition, assorted ammunition, an F.N.
18  PS90 weapon, a Radical Firearms RF-15 rifle, a Bushmaster
19  Carbon 15 rifle, a Lead Star GRUNT 15 rifle, a KelTec
20  12-gauge shotgun, a Glock 19 MGEN5 handgun, and a digital
21  safe.
22      Q.   Was that approximately -- was that eight firearms?
23      A.   Eight total firearms from the residence, and a BMW
24  that was located at the residence.
25      Q.   Have individuals in this case cooperated against Mr.

1  Jeter?
2     A.   Yes.
3     Q.   Did the source of supply who was intercepted
4  speaking with Mr. Jeter cooperate?
5     A.   Yes.
6     Q.   What information did law enforcement learn about Mr.
7  Jeter, and did it corroborate the call information?
8     A.   Yes.  The cooperator stated that between 2021 and
9  the date of his arrest, he had been supplying Mr. Jeter with
10 approximately 18 ounces of cocaine per week, along with
11 half-ounce quantities of fentanyl.  Discussing with the
12 cooperator, the cooperator stated that he had supplied Mr.
13 Jeter with approximately 50 to 100 kilograms of cocaine
14 during that period.
15    Q.   Did other individuals in this case also cooperate
16 against Mr. Jeter?
17    A.   Yes.
18    Q.   Can you give a brief description of what that
19 cooperation entailed?
20    A.   That cooperator stated -- one cooperator stated that
21 it had been a significant amount of time since he had
22 previously supplied Mr. Jeter with cocaine, but recalls
23 supplying Mr. Jeter with approximately 2 kilograms of
24 cocaine.  And then another cooperator had stated that Mr.
25 Jeter was known to distribute cocaine from 605 Chesnee

1  Highway specifically.
2      Q.   Are you aware of whether Mr. Jeter has pending state
3  court charges from a car stop in 2022?
4      A.   Yes.
5      Q.   In that state car stop, what was located in Mr.
6  Jeter's car, if you know?
7      A.   I believe it was a BMW, and there was, I believe, a
8  9-millimeter handgun, in addition to a quantity of cocaine
9  and digital scales.
10          MS. SCHOEN:  No further questions at this time.
11          THE COURT: Okay.  Yes, sir.
12          MR. ANDERSON:  Thank you, Your Honor.
13                        CROSS-EXAMINATION
14 BY MR. ANDERSON:
15     Q.   Agent Criswell, first let's talk a little bit about
16 the arrest of Mr. Jeter.  As I understand it, y'all -- were
17 you a part of the arrest team?
18     A.   I was not, no.
19     Q.   It's your understanding, though, that an arrest team
20 came to the house, and he was arrested without incident?
21     A.   Correct.
22     Q.   So he was there on -- for that portion, he fully
23 cooperated, as far as you know?
24     A.   My understanding, yes.
25     Q.   And as far as you know, he's never confessed to this

11

1  crime; is that right?
2     A.  Correct.
3     Q.  So you don't have any information he ever tried to
4  run from y'all before he was arrested, right?
5     A.  No.
6     Q.  Now let's talk a little bit about this supposed
7  cooperator, or I guess cooperators, rather.  Of course, you
8  know, they're in pretty good trouble themselves.  Is that a
9  fair statement?
10    A.  Correct.
11    Q.  So they've got a strong incentive to try to want to
12 help y'all make a case against somebody, right?
13    A.  Correct.
14    Q.  Because they know that if they can help you make the
15 case, they can shave five or ten years potentially off their
16 sentence, right?
17    A.  Occasionally, yes.
18    Q.  And let's talk about the search of the business
19 there on Chesnee Highway.  As you understand it, there was, I
20 guess, more than one person working at the business, right?
21    A.  I understood there would be multiple people there at
22 the business or at least working at the business, yes.
23    Q.  Of course, when y'all conducted the search, my
24 client wasn't present, right?
25    A.  That's correct.  He was in custody at the time.

1  Q.   And so where were these drugs found?  Were they
2  hidden or were they out in the open?
3  A.   I believe they were hidden in a speaker box.
4  Q.   Hidden in a speaker box.  But there would be more
5  than one person besides my client who would have access to
6  that speaker box immediately before the search, right?
7  A.   That's possible, yes.
8  Q.   And then you said that there was this traffic stop
9  that resulted in the state charges, I guess that were set in
10 February of '22; is that right?
11 A.   That's correct, on the 16th.
12 Q.   All right.  So are you contending that those state
13 charges are related to this conspiracy alleged in this case?
14 A.   Yes.
15 Q.   And you are aware that the bond that was set on
16 those state charges was $7,500 surety; is that right?
17 A.   I am not aware of the bond amount, no.
18 Q.   But he was certainly out of custody when he was
19 arrested in November, right?
20 A.   That's correct, yes.
21 Q.   So I guess if he was arrested in February, posted
22 bond in February, and then he was arrested for this charge in
23 November, that would be, what, nine months out on the street?
24 A.   Roughly.
25 Q.   And you said that y'all found some firearms in the

1  home; is that right?
2      A.   That's correct.
3      Q.   Did you all run any -- a fingerprint testing on the
4  firearms?
5      A.   Not that I'm aware of, no.
6      Q.   Did you run any tests for DNA on firearms?
7      A.   No, not that I'm aware of.
8           MR. ANDERSON:  All right.  Thank you, Judge.
9           THE COURT:  All right.  Any follow-up questions?
10                        REDIRECT EXAMINATION
11 BY MS. SCHOEN:
12     Q.   Were any of the firearms visible in a common
13 location where individuals who lived at the house would be
14 located?
15     A.   I believe the Smith & Wesson SD9 9-millimeter was
16 located on the nightstand.  And the additional firearms,
17 excluding the firearm that was found in the BMW, the other
18 firearms were found in the master closet in the master
19 bedroom.
20          MS. SCHOEN:  Nothing further.
21          THE COURT:  All right.  Thank you, sir.  All right.
22 You may call your next witness.
23          MS. SCHOEN:  With that, the government is prepared
24 to argue for detention.
25          THE COURT:  All right.  Any evidence or witnesses on

1  behalf of the defense at this time?

2           MR. ANDERSON:  Judge, just by way of proffer, I

3  would note, as pretrial services report notes, Mr. Jeter is a

4  life-long resident here of South Carolina.  At the time of

5  his arrest, he was living with his wife.  I've spoken to his

6  wife, who is here in the courtroom today.  She is prepared to

7  have him back in the home.  She supports him.  He has one

8  minor child there in the home.  And then there are two adult

9  children.  She works.  It's my understanding that nobody has

10 any pending criminal charges there, and that he would be set

11 up, if the Court wanted to, to have a landline for an ankle

12 monitor.  So for that, we would say that that's what

13 ultimately we are going to ask for when the time comes.

14          THE COURT:  Okay.  Very good.  Glad to hear from the

15 government.

16          MS. SCHOEN:  Yes, Your Honor.  We will start with

17 the statute.  There's a presumption of detention in this

18 case.  It is a controlled substances offense that carries up

19 to 20 years as it is currently charged.

20          The defendant's criminal history is extensive.  It

21 begins on -- with a possession of crack and a resisting

22 arrest in 1995, includes battery, simple battery, and family

23 violence from 2003, cruelty to children in 2004, simple

24 battery 2004, a 2008 purchase, possession, manufacture,

25 distribution of the sale of marijuana, possession of a

1  firearm or knife during the commission or attempt to commit
2  certain felonies, receipt, possession, or transfer of firearm
3  by a convicted felon, simple battery against a police officer
4  or law enforcement, et cetera, from 2009, with a marijuana
5  possession.
6           Then we have another manufacture, possess other
7  substance, and drug distribute in 2011.  In 2011 also,
8  there's a probation violation.  In 2013, manufacture, possess
9  with intent to distribute again.  And then we have another
10 probation violation from 2014.  It looks to be related to the
11 possession of marijuana, and with intent to distribute and
12 possession of a firearm earlier cited.  At 2020, domestic
13 violence of a high and aggravated nature, and a resisting
14 arrest.  And then he has the pending charges that were
15 discussed earlier.
16          As the Court can see from the timeline of these
17 offenses, it would be incredibly likely that Mr. Jeter was on
18 some form of supervision at the time he was committing these
19 offenses.  And, clearly, based on his probation violations,
20 we can see he was convicted of violating his probation.
21          As the Court has heard, in addition to the drug
22 trafficking, Mr. Jeter has been found with firearms on
23 multiple occasions, which he already has a felony for a crime
24 for possession of a firearm by a convicted felon.  So he's
25 well aware he's not supposed to possess firearms.  This is an

1  incredibly dangerous offense, given that both drugs are a
2  scourge on our society in and of itself, and the addition of
3  firearms is an incredible danger to the public.
4          Mr. Jeter, additionally, given his criminal history,
5  if he were to be charged for the 922(g), which the government
6  has already discussed with both this counsel and prior
7  counsel, the government believes he would be an armed career
8  criminal, given his prior convictions.
9          This case was initially charged based on information
10 that the government had in its possession prior to the search
11 warrants and arrest warrants.  It is not superseded yet in
12 this case.  However, if the government were to proceed on
13 those charges, the government believes it would be 15 years
14 to life that Mr. Jeter would be looking at, given the
15 criminal history that Mr. Jeter has earned over the past
16 decades.
17         Of the final matter concerning the Blood Brothers
18 Detailing, as is indicated as his current employment, this is
19 the same location where Mr. Jeter was distributing drugs to a
20 confidential informant, was meeting with a source of supply
21 for drugs, and was searched and found to contain that
22 cocaine.
23         THE COURT:  Okay.  So I understand you correctly,
24 regarding the firearms, the indictment, the firearms aren't
25 charged?

1         MS. SCHOEN:  That's correct, Your Honor.  In this
2    case, we indicted everyone prior to going down on the T-III
3    investigation, prior to conducting search warrants and the
4    arrest warrants.  This case has not been superseded yet.  But
5    the government has been in discussions with both defense
6    counsels regarding potential of a superseding indictment.
7         THE COURT:  Understood. All right.  Would you like
8    to be heard further, Mr. Anderson?
9         MR. ANDERSON:  Thank you, Judge.  It's my pleasure
10   today to be here for Mr. Jeter.  As you know, he is presumed
11   innocent of all these charges.  So while the government has
12   said a lot about what he did, this and that, of course, those
13   are all allegations.  As I got the agent to concede up on the
14   stand, of course, to the extent there are cooperators or
15   informants, they've got an axe to grind.  So at the trial,
16   the judge would instruct the jury that they are to assess
17   their credibility with greater caution and care.  So I would
18   ask you to discount that too, given his presumption of
19   innocence here today.
20        We've heard about some discovery of drugs,
21   supposedly, at the business.  But we also heard there's other
22   testimony there were other folks who also had access to these
23   drugs.  They were hidden.  So could very well be that they
24   were somebody else's.
25        Mr. Jeter certainly does have some criminal history.

1     But I would also note that the South Carolina magistrate, who
2     no doubt had all the same criminal history, decided that his
3     bond only need be set at $2,500 surety.  So despite all the
4     things we just heard, there's another judge out there
5     somewhere that thought the presumption of innocence means
6     something.  And, of course, that's why we are here today,
7     just to decide what's going to happen between now and the
8     jury trial.  But given that he got a bond in state court,
9     relatively low bond, I would say that, in and of itself, is
10    enough evidence to overcome the presumption of the detention.
11            And, of course, he's not a flight risk.  He's got a
12    family here.  He's a lifelong resident here.  I don't think
13    flight is really what we are talking about.  I think it's
14    more the risk of danger.  But, again, the magistrate in state
15    court didn't think he was a risk of danger.  And I would ask
16    you to concur with his or her finding.  Thank you, Judge.
17            THE COURT:  Thank you very much.  I do agree with
18    you on that I don't see anything regarding being a flight
19    risk.  But I am concerned about his lengthy record, as well
20    as what the agent detailed regarding Mr. Jeter's involvement.
21    What I'm going to do, given your point that another judge has
22    looked at this and issued a bond, I'm going to take it under
23    advisement and look at this myself, study his record.  And I
24    will issue a written order.
25            MR. ANDERSON:  Thank you, Your Honor.

19

1        THE COURT:  All right.  Thank you very much.
2        MS. SCHOEN:  Thank you, Your Honor.
3        (Whereupon, proceedings are adjourned.)

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, Karen V. Andersen, Registered Merit Reporter,

 4   Certified Realtime Reporter for the State of South Carolina

 5   at Large, do hereby certify that the foregoing transcript is

 6   a true, accurate and complete Transcript of Record of the

 7   proceedings.

 8          I further certify that I am neither related to nor

 9   counsel for any party to the cause pending or interested in

10   the events thereof.
```

*Karen V. Andersen*
Karen V. Andersen
Registered Merit Reporter
Certified Realtime Reporter